Good morning, Your Honors. May it please the Court, my name is Bernice Funk, and I would like to reserve two minutes for my rebuttal argument. I have the privilege to represent Mr. Anass Bikri, and I'd ask Mr. Bikri to stand and show you his arms. His tattoos are found in the record at page 198 and 199. Mr. Bikri recently married Ms. Melissa Mays. Thank you for standing. Two days ago, Mr. Bikri moved to the BIA to reopen his case to consider for his adjustment to U.S. resident, a status for which he is fully qualified. Simultaneously, we filed a motion with this Court to hold the case in abeyance and to remand for adjudication of adjustment. This morning, Your Honors can grant Mr. Bikri withholding of removal. As Your Honor, Judge Page has recently noted, the law of asylum and protecting persons of a particular social group or disfavored group, the law is evolving. As it should, and in Mr. Bikri's favor. The expert ethnomusicologist, Dr. Jeffrey Kalin, provided unrefuted evidence that it is more likely that Mr. Bikri will be persecuted in Morocco because of interrelated facts. Mr. Bikri's atheism, his numerous heavy metal music public performances, he is a westernized, tattooed, pierced humanist who has completely rejected Islamic fundamentalism as a young man. Dr. Kalin is an expert in popular Moroccan music and he interviewed Mr. Bikri about his fear of persecution in Morocco. His declaration is in the record at 397 and 399. How do you get over the two years for the fact that your asylum application was late? The one-year bar. Okay, I will speak to that directly, Your Honor. The government's legal error in this is found in mischaracterization of Mr. Bikri's proof burden on changed circumstances. The government says he must prove changed extraordinary circumstances. We are only using changed circumstances and what is reasonable. I think the controlling cases are Tazlimi and Kahramani, excuse my pronunciation, two cases involving persons from Iran. The Tazlimi case, it was ten and a half years after her entry and more than six months after her conversion that her asylum application was accepted. And actually more pertinent in this case, in addition to all the cumulative facts of circumstances, is the Kahramani case because when Mr. Bikri hired counsel, Ms. Amy Kratz, an expert asylum lawyer, he was diligent. He filed for asylum forthwith. So his circumstances have changed over the years. He's 18 years old. He comes to live in Seattle after upbringing in a strict Islamic society. He develops friends. He develops a rejection of Islamic fundamentalism. He develops his music talent as a basis for heavy metal music and engages in many public performances. Meanwhile, in Morocco, similar persons are arrested for, quote, insulting Islamic morals. During the time period May 2006 to August 2007, when Mr. Bikri was represented by prior counsel Frick, he was pursuing an adjustment of residence and he was not concerned with his return to Morocco. But again, when he hired expert asylum counsel, he immediately filed his application and that case is found at 498 3rd 1000. As your honors have told us, this is a fact-based inquiry. What is a reasonable time for changed circumstances for the individual? And I submit Mr. Bikri has made that proof for his asylum case if the expert testimony is credited. And the IJ found Mr. Bikri to be credible himself. So for all we know, looking at the BIA decision where they never mentioned the expert, it probably fell on the floor, the expert declaration. The credibility of the applicant, it fell on the floor of the other side. So it's very impossible for you esteemed judges to have a reasonable opinion to review. But here we are reviewing both the BIA case and the IJ case because the BIA adopted the IJ's facts. But the reason we're seeking remand and asking this particular panel to hold the case in abeyance is that the agency cannot find these facts. Again, they didn't mention ethnomusicologists and this is substantial evidence obviously that they did not consider. The expert gave an individualized, objective, corroborating opinion as to Mr. Bikri's truthful, subjective fear of persecution in Morocco. The agency has not analyzed the expert evidence and they violated the black letter law, particularly reaffirmed in the Ponglianan case, where the court has directed the agency must have a, quote, scrupulous and conscientious exploration of the facts and relief, quote. Here we have nothing even close to that. I call your attention to pages 13 and 14 of our opening brief, where we summarize the unrefuted expert testimony. He considers Mr. Bikri's atheism, his physical appearance, his heavy metal music lifestyle, including the tattoos and piercing that he's perceived as westernized and lacking a religious social network, according to the expert. The expert says, Mr. Bikri's appearance and beliefs and lack of social network make it more likely that he would be a target for persecution and violence. More likely is certainly more than 10%. I submit that more likely is more than 50%. Again, there's no discussion in the BIA opinion about credibility and the fact that in this circuit, a credibility finding means that the applicant is truthful. I would recommend to your honors in the record, Mr. Bikri's very truthful declaration found at pages 181 and 186, when he describes why and how he rejected his upbringing of fundamentalism. In denying asylum on the merits, the most clear IJ fact error is found in the middle of page 71. The IJ opinion is at 6474. The IJ says there is no objective evidence that is more likely than not that Mr. Bikri will be targeted for persecution in Morocco. This assertion is contradicted in full by the unrefuted expert evidence of record. According to the IJ, Dr. Callen, quote, reflects concern, quote, that Mr. Bikri will be targeted for physical harm. Actually, Dr. Callen's opinion is far beyond concern. Dr. Callen states that given the appearance, beliefs, it is more likely Mr. Bikri will be targeted for persecution and violence in Morocco by individuals or groups that find him threatening or offensive to, quote, Islamic morals. Going on page 72 of the IJ decision, there are at least 10 more distortions of the record facts. When Mr. Bikri and Dr. Callen are properly credited as truthful and expert, we find that the IJ denial is not supported by substantial evidence. The evidence compels a grant of asylum and withholding based on a well-founded fear of future persecution on a counterprotected grounds, as in the Pordomo case, as in the Walkery case. Again, the subjective truthful evidence of Mr. Bikri is corroborated by his expert. And I would refer you to footnote six of the opening brief at page 11, and this is the truth. I fear physical harm and social and artistic expression. I fear being targeted by anti-American and anti-Western elements who have governmental support. I fear identification as an infidel by a government and society that will not tolerate atheism. I know that having embraced a very different way of life here in the U.S., I will be persecuted by those in Morocco, increasingly under fundamentalist Islamic influences who believe body art, tattoos, and metal music are sinful and punishable. I submit that the government's own evidence in the state reports show that torture persists in the record at page 282. And contrary to the confusion in this BIA decision, this court can take judicial notice that the theocracy of Morocco does not tolerate the rejection of Islam, and that the monarchy does not control Islamic fundamentalists persecuting non-believers, for example, tattooed and into heavy metal music. I forgot to mention the heavy metal music devotees imprisoned in Morocco in 2003. Mr. Beek refers to this, excuse me, in his testimony at 143 and 154, and the BBC report of the event is at pages 233 and 234. Heavy metal musicians and their fans were convicted of quote acts capable of undermining the faith of a Muslim quote and quote infringing morals quote. Another example of record fact distortion is found in the last page of the BIA decision, page 6, paragraph 2, first sentence about the Moroccan government's religious tolerance, and citing the respondent's brief at page 11. This is just disingenuous, as the prior counsel said. This is our record at page 20 and 21. In contradiction, Mr. Beekery argues with supporting evidence the religious intolerance of Morocco. Respondent is unqualifiedly misstated here, and the agency erred in speculating that Mr. Beekery can remain unharmed if he conceals his atheism in contradiction to Zhang versus Ashcroft. I'll sit down and thank you. Thank you counsel. May it please the court, Rebecca Hoffberg on behalf of the respondent, the United States Attorney General. In this case, the agency correctly found that petitioner's asylum application was untimely, and that he failed to show that he would more likely than not be if he were to return to Morocco. Let me ask you what the avenues might be that are available to the petitioner in view of his recent marriage. Is that something that upon a motion to reopen would change things for him? Petitioner actually filed an I-130 previously in this case based on a marriage to someone else, so presumably he's well aware of the procedures to take, he's taken them before in terms of filing the 130 and waiting for the approval. As far as I know, he was just married a couple weeks ago, and that an I-130 has been filed. There's been no action taken on it yet, and that as of just a couple days ago, a motion to reopen was filed with the board. And I have informed counsel that seeking approval from DHS going into a joint motion to reopen would be an option in this case, but that it is entirely independent from the merits of this asylum withholding. Well, if that is an option, would it be advisable for the court to send this case to mediation so that the government and the petitioner could discuss the potentially appropriate procedures that could be followed? Your Honor, in this case, the 130 has nothing about the marriages has been proved to be bona fide yet. I know it said bona fide in her letter. Nothing has been ruled on with the I-130, so at this point it's very premature, and as I mentioned in this case, the merits are entirely independent of that. In terms of adjudicating this case, there'd be no reason not to determine on the facts and the law of this case. Well, there would be if there's another avenue of relief. It would be sort of pointless for us to go through the legal analysis if there's some other independent reason why the petitioner could stay. I mean, it's just a matter of judicial economy for us not to decide a case that doesn't have to be decided. That's why I'm asking the question, not that they're legally intertwined. In terms of our position is that you can hear the merits if you wanted to wait to issue a decision. Of course, this court can issue a decision, you know, if and when it pleases, but... Well, beyond that, beyond the fact that we can wait, we have, as you probably know, a superb mediation department which meets fairly regularly on cases with, I guess, with oil, and some of the cases they do work out rather than go through the cumbersome procedures that are required. They sometimes cut to the heart of them and decide that they're going to work something out practically, and sometimes they don't, you know. I think what Judge Graber is asking you is, is there any reason we shouldn't try that first before we go to the extreme of, you know, issuing a decision which, I don't know what would happen. We issue a decision, you can deport somebody or remove somebody, then you remove them before all the other opportunities can be explored. Is there any reason not to treat this case as we have a number of the others where there have been marriages, and then the government gets together with the counsel for the other party and sees whether there's a possibility of resolving it without going through the ultimate legal proceedings? Well, at this point, the motion to reopen, though, is clearly untimely for an adjustment, and it therefore requires the consent of DHS or the board to sua sponte, reopen in this case. Had it been much earlier in the process, you know, had I not found out about this a week ago, had he not gotten married a couple weeks ago, there might have been some reason to hold it or consider that but that is a separate, it is a very separate determination, and it's not one that's going to be done by my office. So, from our perspective... Which office would it be done by if we sent it to mediation? Well, it would have to wait for DHS to agree to join in the motion or for the board to say so. No, no, they wouldn't have to join in the motion. Well, they don't have to. If we did mediation, someone, I don't know who it would be, but someone from one of these offices in the government could meet with our mediator on the other side and see if there was a practical way to resolve it. I mean, the only way, essentially, to hold this case while he files, while the I-130 is pending, while we're waiting for the 130 to be approved and to be sure that this is, in fact, a bona fide marriage, you know, as you recall, his application for adjustment fell through the first time around. That is what he pursued another time based on a marriage, and that didn't pan out, which is why he eventually applied for asylum, and which is why the asylum application wasn't ultimately filed until too late based on a lot of other circumstances. That was totally unrelated to his asylum claim, which is why we argue that it was not a changed circumstance. But, in any event, the fact is that, as we can see specifically in this case, the fact of a marriage doesn't mean that it is going to And so to hold this indefinitely at this point is, you know, we don't see any reason to do that because it's so far, I mean, it's so far removed at this point from actually being reopened and actually him seeking, being eligible for the relief he seeks, it's not even clear yet that a 130 will be approved. So that's why in this case, because of the timing, it doesn't seem appropriate, in this case, not to rule on the merits and to allow him to seek them. What's the practical aspect? If it were determined to be a legitimate marriage, what would, is there a waiting period of any kind, or do they just adjust status quickly? I mean, he would, once the 130 is approved, assuming that, you know, she is a U.S. citizen, and there would be an immediately available visa, he'd apply for adjustment. Again, though, it has to be done in a motion to reopen at this point, and it has to be, and it's an untimely motion to reopen. So you're assuming a lot at this point, that it's a bona fide marriage, that the 130 would be approved, that either DHS would agree or that the board would sui sponte reopen, and that he would show the eligibility for adjustment. It's very far removed at this point. So mediating, so-called mediating this, that's really, there's nothing really to discuss in terms of the merits. It's all in an adjudicatory process right now that would be beyond my office's control. That would just be a matter of time, really, for a very speculative form of relief right now. Which office's control is it within? As far as the 130 goes, that would be the USCIS, and then as far as seeking a motion to reopen for adjustment, that would be, like I said, that would be coming from the Department of Homeland Security or the Executive Office of Immigration Review in terms of looking at the adjustment, because it's being filed at this point in time after he's been in removal proceedings. It is one government. It is one very speculative at this point, and it relies on the assumption of many decisions being made that are not going to be made necessarily quickly enough to make it, and putting it in mediation, there's nothing really to mediate except to see what happens with all these speculative steps in the process. And as, and Severin were clear in this case, because he thought he could do that previously, and he waited, you know, a couple years to see if that would work out before, and it didn't. And I think that that's very, it's, it happens to be that this happened before in this case. So I think in this case, you never, it's very reasonable to say you don't know the outcome of pursuing that form of relief. Okay, thank you. I just wanted to quickly get to the asylum application timeliness in this case very quickly, and then I want to address the two-year delay. Well, you're not going to do all of that in one minute. Okay, the two-year delay. I'll give you an extra minute, though. Okay, thank you, Your Honor. The two-year delay was correctly found to be unjustified because once he committed himself to atheism, which was the basis of his belief, the reasonableness of a delay, it doesn't matter what was actually cited for it in terms of was it an extraordinary circumstance or a changed circumstance, you really, opposing counsel seems to make more of that just because there was maybe some typo in the brief about changed or extraordinary circumstances. They were only claiming changed, and that means it has to be material to the claim. So after he became committed to atheism, his claim, well, my attorney wasn't... Where did you pinpoint that? According to his testimony, he said it was three or four years ago from his 2008 hearing. So we were, you know, we gave the maximum, I guess, amount of time that he could have been saying, which was 2005. And so by 2005, he was committed to that, and the only excuses he gives after that point relate to trying to seek adjustment, and his attorney was not effective, but he never pursued any formal claim against his attorney. He simply got another attorney, and those would not be material to his claim for asylum. And so therefore, the two-year delay was unreasonable, and the asylum application was untimely. Now, getting to the withholding of removal claim, really quickly, there's been a lot of back and forth about particular social group versus disfavored group in this case. And counsel, one of the first things she said was that he showed both, or she sort of interchanged them. And the problem in this case is that the way it was presented to the immigration judge was, petitioner is an individual who has these characteristics, not there is a disfavored social group. And if you look, you can look in the record on page 14 of the brief to the board, and page 179, the brief to the IJ, just lays out the boilerplate for disfavored group in terms of what was presented to the IJ. And then in terms of what was presented to the board, it was mostly trying to show pattern and practice of persecution and trying to liken him to the Baha'i, which is not at all correct based on the country reports that clearly distinguish atheists from that particular Muslim group. And so the fact is it's only, it's an evolving claim now. So now in the reply brief, it's on page 9, now it's saying the board erred in not reviewing the disfavored social group claim because now there's a disfavored group of people like him. The board and the IJ analyzed that in terms of similarly situated people and looked at the fact that the only evidence that he did offer was speculative. And she very much emphasized that the expert testimony was ignored. It was not ignored at all. The immigration judge went on at length on pages, in the record, it's pages 5 and 9 of his actual decision, which are cited by the board, but in the record, that would be pages 68 and 72. And that's how the board does that refers to the testimony. So while the board does not name Callan by name, it refers to the testimony, essentially his, his, not the testimony, I'm sorry, his affidavit. His affidavit basically rests, everything about his opinion is based on the fact that there was an arrest of 14 musicians in 2003. And the immigration judge weighed this against all of the country reports in the record that weren't showing any continued targeting of musicians. This was an incident that occurred in 2003. And then based on that incident, that's why, you know, the only thing supporting what he says is that, you know, I believe that he will be targeted based on his, you know, he's a potential, potential target of violence in one of his statements. And then the immigration judge more found that this was insufficient and that there was not evidence of more likely than not, which is what was required. And opposing counsel said during her argument that she submits that his statement of more likely means more likely than not. The fact that he was more likely to be targeted because of his appearance, that's very different. He may have been a potential, potentially more likely, but more likely than what is, is the question. And the immigration judge looked at this and found that really the only concrete thing that the expert was pointing to was this arrest in 2003 and was this general strife going on, none of which showed individualized persecution to the extent necessary. And so the fact is that the agency did review it, and the agency isn't required to specifically parse and refute each sentence or each piece of evidence, but it did indicate that it reviewed the evidence. Thank you, Kev. Thank you. Thank you. I would like to work backward slightly from, to rebut what my colleague has stated on the withholding claim that we presented Mr. Bikri as an individual. Well, if the government was kind enough to reasonably consider the expert declaration where the expert is qualified by his expertise in four factors of discriminatory treatment and the government of Morocco not being able to control the fundamentalists, I submit that we have presented the disfavored group evidence and the individual evidence. Returning to what Ms. Hoffberg said about the prior filing of a marriage petition adjustment application, there was a lot of confusion there. The adjustment application was never filed. The prior lawyer told the immigration judge he filed it in July. The fee waiver was denied in October. It was finally filed in December of 2006. And as of yesterday when I checked, it's still sitting there. That prior lawyer did not know how to file what they call the one-step adjustment package. And believe me, Your Honors, I have a lot of experience with couples who marry and with the difficulties of getting these remedies in proper order when you're approaching an oral argument. I believe this is a bona fide marriage. The one-step adjustment and the motion with the BIA to reopen is timely and have been filed, and we would welcome the opportunity to mediate for the relief that Mr. Bikri is entitled to. Thank you very much. Thank you, counsel. Case just argued will be submitted. The court will stand in recess for the day. All rise.
judges: Reinhardt, Graber, Paez